James William RILEY, Petitioner,

v.

Robert E. SNYDER, Warden, Delaware Correctional Center, and Charles M. Oberly, III, Attorney General of the State of Delaware, Respondents.

Civ. A. No. 91–438–JJF.

United States District Court,
D. Delaware.

Dec. 20, 1993.

Lawrence J. Connell, of Widener University School of Law. Thomas J. Allingham, II, and Mary M. MaloneyHuss, of Skadden Arps Slate Meagher & Flom, Wilmington, DE, for petitioner.

Fred S. Silverman, Chief Deputy Atty. Gen., and Manuela DiNardo, Deputy Atty. Gen., Dept. of Justice, Wilmington, DE, for respondents.

## OPINION

FARNAN, District Judge.

### I. INTRODUCTION

Presently before the Court is a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. The Petitioner, James William Riley, is a state prisoner. Petitioner instituted the instant action for federal habeas relief on August 12, 1991. On August 13, 1991, the Court stayed Petitioner's execution and ordered briefing on the need for an evidentiary hearing as well as the merits of Petitioner's claims. For the reasons outlined below, the Court will deny the writ on the record before it.

### II. FACTUAL BACKGROUND [1]

On February 8, 1982, Tyrone Baxter ("Baxter") and Petitioner agreed to rob a liquor store. Michael Williams drove Petitioner and Baxter to a liquor store owned by James Feeley. Upon arrival at the liquor store, Petitioner placed a quart bottle of beer on the counter and paid for it. When Mr. Feeley opened the cash register, Petitioner drew a pistol and took approximately $150.00 from the register. When Petitioner attempted to take Feeley's wallet, Feeley resisted. At the urging of Baxter, Petitioner shot Feeley in the leg. Feeley retaliated by throwing a bottle of wine at Petitioner as Baxter and Petitioner were leaving the store. Petitioner then shot Feeley in the chest at close range. Baxter hid behind a cigarette machine. Baxter and Petitioner fled, leaving Feeley mortally wounded. Williams then drove Petitioner and Baxter to a bus station.

Petitioner pleaded not guilty to each of the five charges brought against him by the State of Delaware. He testified at trial that he was in Philadelphia the entire day of the robbery. Petitioner also presented the testimony of Gary Walter Momenko, an inmate at the Delaware Correctional Center, who testified that Baxter told him that he, Baxter, not Petitioner shot Feeley.

In response to Petitioner's chief defense, the state presented evidence establishing that Petitioner's fingerprints were on the beer bottle found on the counter in the liquor store at the time of the robbery. The state also presented the testimony of Tyrone Baxter's mother that Petitioner spent the night before the robbery at her house in Dover.

### III. PROCEDURAL HISTORY

On December 20, 1982, Petitioner was convicted in the Superior Court of Kent County of two counts of murder in the first degree— intentional murder and felony murder, robbery in the first degree, possession of a deadly weapon during the commission of a felony, and conspiracy in the second degree. On December 20, 1982, Petitioner was sentenced to death for felony murder.[2] On February 25, 1983, he was sentenced to life imprisonment without parole for the intentional murder conviction, twenty years imprisonment for robbery, five years imprisonment for possession of a deadly weapon, and three years for conspiracy.

Petitioner challenged his conviction and sentence on direct appeal asserting numerous grounds including: (1) the prosecution exercised its peremptory challenges for racial

---

1. The following findings are based on the Delaware Supreme Court's decision on Riley's direct appeal, 496 A.2d 997 (Del.1985) and the Court's independent review of the transcripts of Riley's trial as well as the remainder of the state court record.

2. The state sought and obtained a sentence of death for the felony murder only.

reasons; (2) trial court erred in not granting Petitioner's motion for change of venue; (3) dual use of the underlying robbery conviction was improper; and (4) his sentence was disproportional. The Delaware Supreme Court affirmed the convictions and sentences. *Riley v. State,* 496 A.2d 997 (Del.1985), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) (*Riley I*).

On March 6, 1987, Petitioner filed for post-conviction relief from the Superior Court. The Superior Court held three hearings on the issue of ineffective assistance of counsel on October 20, 1987, November 23, 1987, and November 25, 1987. In a twenty-seven page opinion, the Superior Court denied Petitioner's motion for post-conviction relief. In its decision, the Superior Court addressed three of Petitioner's claims, specifically: (1) the state's exercise of its peremptory challenges; (2) the adequacy of the trial court's voir dire of juror's attitudes regarding the death penalty; and (3) ineffective assistance of counsel during the penalty phase of Petitioner's trial.

On May 5, 1988 Petitioner moved for reargument and appealed to the Delaware Supreme Court. Subsequently, Petitioner filed a motion requesting the Delaware Supreme Court to stay briefing on his appeal and to remand his case to the Superior Court to consider his motion for reargument. On July 19, 1988, the Delaware Supreme Court remanded Petitioner's case to the Superior Court, as requested.

On November 15, 1988, the Superior Court granted in part Petitioner's motion for reargument. Following an evidentiary hearing, the Superior Court found no merit to Petitioner's claim of racial discrimination based on *Batson.* The Superior Court also summarily rejected Petitioner's remaining claims for post-conviction relief as having been previously raised and rejected by either the Superior Court or the Delaware Supreme Court. On December 21, 1990, the Delaware Supreme Court affirmed the Superior Court's decision denying Petitioner post-conviction relief. *Riley v. State,* 585 A.2d 719 (Del.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2840, 115 L.Ed.2d 1008 (1991) (*Riley II*).[3]

Petitioner filed this petition for a writ of habeas corpus on August 12, 1991. In his petition, Petitioner raises the following grounds for relief: (1) the prosecutor's use of peremptory challenges to strike three black persons on the venire violated his rights under the Sixth and Fourteenth Amendments; (2) ineffective assistance of counsel; (3) remarks by the prosecutor and the trial court during the penalty phase violated his Eighth and Fourteenth Amendment rights; (4) improper jury instructions following the penalty hearing violated his Eighth and Fourteenth Amendment rights; (5) trial court's failure to question prospective jurors about whether they would be inclined automatically to impose the death penalty violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights; (6) trial court's failure to grant Petitioner's motion for change of venue based on alleged prejudicial pretrial publicity violated his Sixth and Fourteenth Amendment rights; (7) the use of Petitioner's conviction on the robbery charge as a basis for the first degree murder conviction and as a statutory aggravating circumstance violated his rights guaranteed by the Eighth and Fourteenth Amendments; (8) the trial court's failure to appoint co-counsel or an investigator violated his rights guaranteed by the Sixth and Fourteenth Amendments; (9) the Delaware Supreme Court's proportionality review was so arbitrary and capricious it violated Petition-

---

**3.** Riley raised eight claims in his appeal of the Superior Court's denial of his motion for post-conviction relief. The Delaware Supreme Court refused to address four of the claims as barred under Superior Court Crim.Rule 61(i)(4): (1) trial court's denial of co-counsel or an investigator; (2) trial court's denial of Riley's motion for change of venue based on prejudicial pretrial publicity; (3) alleged prejudicial statements of prosecutor and trial court during penalty phase; (4) court's allegedly flawed proportionality review. *Id.* at 721. Riley's four remaining

claims—(1) the trial court's instructions to the jury in the penalty phase were constitutionally inadequate; (2) the Superior Court improperly applied the standards of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) the trial court erred by failing to probe whether jurors would automatically impose death upon a finding of guilt; and (4) ineffective assistance of counsel during the penalty phase— were considered on the merits and rejected by the Delaware Supreme Court.

er's rights to due process and equal protection as guaranteed by the Fourteenth Amendment, and the resulting death sentence constituted cruel and unusual punishment in violation of the Eighth Amendment.

## IV. *DISCUSSION*

■ Before turning to the substantive merits of Petitioner's claims, the Court must satisfy itself that Petitioner has exhausted each of his claims in state court, 28 U.S.C. § 2254(b), and that federal habeas review of any of the claims is not barred because a Delaware state court has determined that Petitioner defaulted the claim by failing to comply with a state procedural rule. *Coleman v. Thompson*, — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Santana v. Fenton*, 685 F.2d 71, 73 (3d Cir.1982), *cert. denied*, 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 968 (1983). A review of the state court proceedings reveals that, with the exception of one claim,[4] Petitioner has presented each of his claims to the state court either on direct appeal or in post-conviction proceedings. Therefore, the Court concludes that Petitioner has exhausted his state court remedies as to each of his claims. It is also apparent, again excepting one claim, that Petitioner has not procedurally defaulted on any of his claims. Accordingly, the Court will address the merits of each of Petitioner's claims.

### A. Evidentiary Hearing

■ Petitioner has requested an evidentiary hearing on most of the claims set forth in his petition. Rule 8 of the Rules Governing Section 2254 Cases provides that the Court, "after the answer and the transcript and the record of state court proceedings are filed, shall, upon review of those proceedings ... determine whether an evidentiary hearing is required." The burden is on the Petitioner

to establish that an evidentiary hearing is needed. *Reese v. Fulcomer*, 946 F.2d 247, 255 (3d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992).

The Court has before it copies of the essential motions, briefs and orders filed in the Petitioner's state court proceedings, the transcripts of two hearings in which the trial judge denied Petitioner's motion for appointment of counsel, the trial transcript, and the transcripts of the two post-conviction evidentiary hearings conducted by the state court. Upon review of these materials and the factual determinations made by the state judges contained therein, the Court concludes that the state court record provides a sufficient basis upon which to decide the merits of Petitioner's claims. Although Petitioner, citing *Townsend v. Sain*, 372 U.S. 293, 313–19, 83 S.Ct. 745, 757–60, 9 L.Ed.2d 770 (1963), asserts that further factual findings are required as to some claims, and that the factual findings of the state courts are unsupported by the record as a whole as to other claims, the Petitioner has not presented any specific and convincing evidence beyond broad and conclusory allegations to justify holding an evidentiary hearing on any of the claims. *See Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir.1991). Accordingly, the Court will resolve Petitioner's claims on the record before it.

### B. The Prosecutor's Use of Peremptory Challenges

■ The first ground that Petitioner raises in support of his request for federal habeas relief is that the Delaware trial court improperly applied the standards of *Batson v. Kentucky* in reaching its determination that the respondent did not use its peremptory challenges in a racially discriminatory manner.[5] In *Batson*, the United States Su-

---

4. *See infra* Section IV.C.1.

5. Petitioner's argues that an evidentiary hearing is required on this claim because the trial court made no express finding of fact as to the evidence relating to the alleged pattern of striking black venirepersons. Petitioner contends that the trial court ignored evidence that (1) the prosecutor treated black jurors disparately from white jurors, and (2) in four first degree murder

trials within a one year period, the prosecutor removed all black venirepersons. Opening Brief, at 6–12.

Petitioner's argument is specious. The Superior Court held an evidentiary hearing solely on the *Batson* issue. The Respondent and Petitioner presented witnesses and exhibits, including relevant portions of the voir dire of the jury panel. The statistical evidence was presented to the state court. Contrary to Petitioner's arguments,

## 1020

preme Court outlined a three-step process for evaluating allegations that a prosecutor used peremptory challenges in a racially discriminatory manner. First, the defendant must establish a prima facie case that the prosecutor exercised peremptory challenges on the basis of race. *Id.* at 96–97. Then the prosecutor has the burden of articulating a race-neutral explanation for exercising the challenges being questioned. *Id.* at 97–98, 106 S.Ct. at 1723–24. Third, the trial court must decide whether the defendant has carried his burden of purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1723–24.

The trial court found that Petitioner had presented a prima facie case of racial discrimination in the manner the prosecution used its peremptory challenges. However, after a full and complete evidentiary hearing, the trial court concluded that Petitioner had not met his burden of demonstrating that the prosecution's articulated race-neutral reasons were pretextual. Appendix, at 1147. The question before this Court is " 'whether the record before [it] shows, on its face, that the state trial judge fairly and adequately considered the matter and, after that consideration, that the trial judge's finding that the prosecutor's peremptory challenges were not racially motivated is fairly supported by the record." *Riddick v. Edmiston,* 894 F.2d 586, 589 (3d Cir.1990) (citing 28 U.S.C. §§ 2254(a) & (d)); *Jones v. Ryan,* 987 F.2d 960, 966 (3d Cir.1993).[6]

The record shows that after the trial court completed its general voir dire and those responding affirmatively to the general questions were dismissed, the jury was drawn from the remaining array, which included five black jurors. Two of the five remaining black jurors and a greater number of white jurors were excused by the trial judge for cause based upon their views on capital punishment. *Riley I,* 496 A.2d at 1010. Petitioner exercised all 20 of his peremptory challenges, while the state exercised 11 of the 12 to which it was entitled. The state used three of its challenges to strike each of the remaining three black jurors in the array. Appendix, at 25–179.

Petitioner did not object to the state's exercise of its peremptory challenges at trial or on direct appeal, but raised the issue for the first time in his motion for state post-conviction relief. Although the Superior Court initially denied petitioner's motion for post-conviction relief without a hearing on the *Batson* claim, the Superior Court reconsidered the Petitioner's *Batson* claim on Petitioner's motion for reargument. In a memorandum opinion dated November 15, 1988, Appendix, at 1039, the Superior Court found that Petitioner had demonstrated a *prima facie* case of racial discrimination in the prosecution's exercise of its peremptory challenges.

On December 30, 1988, the Superior Court held an evidentiary hearing solely on Petitioner's *Batson* claim. Appendix, at 1040–1140. The court heard testimony from the two prosecutors and one of the challenged jurors. In addition, the court had before it the relevant portions of the trial transcript relating to the voir dire of the jury. The court made a specific finding that the prosecution provided a "credible, race-neutral reason for exercising its peremptory challenge of each of the black jurors", i.e. the prosecutors based their juror selections on two legit-

---

the state court made clear and specific findings of fact concerning the prosecutor's race-neutral reasons for exercising their peremptory challenges. The fact that the Court did not expressly address certain evidence presented by Petitioner does not necessarily entitle him to an evidentiary hearing on habeas review.

Petitioner is entitled to an evidentiary hearing only if he can show cause for his failure to develop the facts in the state court proceedings and actual prejudice resulting from that failure. *Keeney v. Tamayo–Reyes,* —— U.S. ——, ——, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992). Petitioner has not demonstrated any cause for his failure to previously develop the facts in the state court that he seeks to develop here. Absent a

showing of cause and prejudice, the Court will review Petitioner's *Batson* claim on the record made in the state court.

6. A habeas petition based on the invocation of the *Batson* rule ... involves mixed questions of law and fact. On questions of fact [the court] review[s] findings of the state court ... for clear error. Specifically, [the court] must accord the state courts' findings of fact a presumption of correctness. On questions of law, [the court's] review of the state courts' ... ruling is plenary.
*Jones v. Ryan,* 987 F.2d 960, 965 (3d Cir.1993).

imate factors—whether the prospective juror would impose the death penalty, and whether the prospective juror would be attentive. Appendix, at 1144.

The Court made further findings with respect to each of the black venirepersons struck by the prosecution. Ray Nichols was the first prospective juror struck. The prosecutor testified at the December 30, 1988 hearing that he struck Nichols because Nichols paused significantly when responding to questions concerning his ability to impose the death penalty. The Superior Court accepted the prosecutor's explanation that Nichols was struck because they doubted his ability to impose the death penalty. Judge Steele stated "I find the State provided a credible, race-neutral reason for exercising its peremptory challenge after appraising the demeanor and credibility of the juror. The State's exercise of its peremptory challenge was non-discriminatory. I am satisfied that the peremptory challenge was not made on the ground of the juror's race." Appendix, at 1145.

The second black venireperson struck by the prosecutors was Charles McGuire. The prosecutor testified that he struck McGuire because he believed McGuire requested to be excused from jury duty and was concerned with McGuire's attentiveness for the entire trial. Although at the evidentiary hearing, McGuire testified that it was his employer, not he, who had sent the letter requesting he be released from jury duty, the Judge Steele found the prosecutor's belief that McGuire would be unwilling to serve the entire trial was credible.

The letter by McGuire's employer [requesting McGuire be released from jury duty because McGuire could not be replaced] clearly gave the state reason to question whether McGuire would give his full time and attention to the trial and whether he would be able to serve for the entirety of the time projected for the trial. Whether McGuire, in fact, did not request relief from jury duty and did wish to serve is of no consequence. The test applied is the credibility of the explanation given for a clear and reasonably specific basis for the challenge that is racially neutral. I find this reason to be clear, reasonably

specific and entirely unrelated to the juror's race.

Appendix, at 1145–46.

The third black venireperson struck by the prosecutors was Lois Beecher. The prosecutor testified that he actually wanted Beecher on the jury, and that he and his co-counsel "agonized over Miss Beecher." Judge Steele made the following findings with regard to the prosecutors' reasons for striking Beecher:

Miss Beecher articulated that she did not think she would be able to impose the death penalty. She also seemed confused by the voir dire. The prosecutors wished to have Miss Beecher on the jury, but her views on the death penalty precluded them from choosing her.

Appendix, at 1146. The facts convinced Judge Steele that the state had satisfactorily provided a race-neutral explanation for its peremptory strike of Miss Beecher, and that the strike was based on "specific individual juror bias." Appendix, at 1146. The trial judge concluded:

The State ... provided race-neutral explanations for the peremptory challenges on all three black jurors. After examining the demeanor and credibility of the witnesses and prosecutors at the evidentiary hearing, I believe the State exercised its peremptory challenges entirely within the structures of the Fourteenth Amendment. No factual basis exists for a successful claim of an equal protection violation.

Appendix, at 1146–47.

■ The trial court's findings as to the credibility of the prosecutor's explanation is presumptively correct and entitled to deference by this Court. See 28 U.S.C. § 2254(d); *Riddick v. Edmiston,* 894 F.2d 586, 692 (3d Cir.1990). In *Hernandez v. New York,* 500 U.S. 352, —— – ——, 111 S.Ct. 1859, 1868–69, 114 L.Ed.2d 395 (1991), the United States Supreme Court stated, "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference...." The court explained the rational behind this deference:

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence will often be the demeanor of the attorney who exercises the challenge.... [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* at ——, 111 S.Ct. at 1869 (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985). The record shows that the state court assessed the prosecutor's proffered reasons for challenging Nichols, McGuire and Beecher, and found the prosecutor's explanation credible. The trial court then found that the prosecutor's use of the peremptory challenges was racially neutral. The findings are supported by the record and are, therefore, presumptively correct.

■ Contrary to Petitioner's contentions, *Jones v. Ryan,* 987 F.2d 960 (3d Cir.1993) does not compel the Court to find otherwise. In *Jones,* the Court of Appeals for the Third Circuit reversed a district court's denial of the habeas petition based on a violation of *Batson.* The Court of Appeals found that the prosecutor's explanations for striking two black jurors were pretext in part because the prosecutor did not strike white jurors with similar characteristics. *Id.* at 969, 973–75.

The Petitioner's reliance on *Jones* is unavailing for two reasons. Most significantly, the Court notes that in *Jones,* unlike this case, there were no presumptively correct state court factual findings to guide the district court or Third Circuit in reviewing the state court's disposition of the *Batson* claim. As the Third Circuit stated,

[N]either the trial court nor the state appellate court made a finding whether Jones established a *prima facie* case of racially discriminatory exercise of peremptory challenges by the prosecutor. Additionally, the state courts failed to make any finding whether the prosecutor provided race-neutral explanations for eliminating three black venirepersons. More importantly, the state trial court failed to make a

finding concerning the "ultimate question [whether the prosecutor] intentional[ly] discriminat[ed]" against any one of the three black venirepersons whom he excluded in exercising peremptory challenges.

*Jones,* 987 F.2d at 966 (citations omitted) (footnotes omitted). Having found there were "no findings of fact made below to which [they] must accord a presumption of correctness" the Third Circuit conducted a plenary review of the state court's *Batson* determinations.

In contrast, the Court has before it specific and particularized findings by the state court on the issue of whether the prosecutors exercised their peremptory challenges in a discriminatory manner. Although the Petitioner presents some evidence that white jurors with characteristics similar to those black jurors struck from the array, the Superior Court was presented with this same evidence and found the prosecutor's explanations credible. The state court's credibility determination is entitled to great deference.

Moreover, *Jones* is factually distinguishable from the petition now before the Court in that in *Jones* the only explanations the prosecutor offered to justify his striking three black venirepersons were broad, nonspecific policy statements, including one statement by the prosecutor that "if there's a young potential juror as the same approximate age *and race* of the defendant, as a general rule, if I have enough strikes, I will keep them off the jury." *Jones,* 987 F.2d at 973 (emphasis added). The Third Circuit found the prosecutor's reasons for striking the jurors insufficient to survive a *Batson* challenge in part because "the stated policy reasons [were] not related in any real sense to the particular events which transpired during the voir dire proceedings" and because race admittedly was a factor. *Jones,* 987 F.2d at 974.

Unlike *Jones,* the state court found that the prosecutors in the instant case provided specific explanations for striking each of the jurors which were grounded in each potential juror's responses to questioning at voir dire. Without some evidence to the contrary, the Court cannot say that these findings are clearly erroneous.

Based on the factual findings of the state court, the Court concludes that the Petitioner failed to meet his burden of proving that the prosecutors' race neutral explanation for striking the three black venirepersons was a pretext. Accordingly, Petitioner's claim that the prosecutors violated his right to equal protection under *Batson* will be dismissed.

## C. Ineffective Assistance of Counsel During the Penalty Phase

■ Petitioner raises numerous arguments in his Petition that relate to ineffective assistance of counsel in violation of his Sixth, Eighth[7] and Fourteenth Amendment rights. In order to be successful on an ineffective assistance of counsel claim, Petitioner must establish (1) that trial counsel's performance fell below an objective standard of reasonableness, and (2) there exists a reasonable likelihood that but for counsel's deficiency, the result of the proceeding would have been different. *Government of V.I. v. Forte,* 865 F.2d 59, 62 (3d Cir.1989) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

■ As with the issue of whether the prosecutor's use of peremptory strikes violated the Equal Protection Clause, the issue of ineffective assistance of counsel is a mixed question of law and fact. State court factual findings about counsel's performance are presumed correct so long as they are fairly supported by the record. 28 U.S.C. § 2254(d); *Reese,* 946 F.2d at 254. However, state court conclusions about the reasonableness of trial counsel's conduct and the existence of prejudice resulting in such allegedly ineffective conduct are not findings of fact binding on federal courts. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070–71, 80 L.Ed.2d 674 (1984); *Reese,* 946 F.2d at 254.

■ In reviewing an ineffective assistance claim, the Court must consider the totality of the circumstances of trial counsel's representation. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Moreover, the Court "must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. at 2065 (citations omitted).

Petitioner asserts that his trial counsel was ineffective during the penalty phase of his trial in failing: (1) to adequately apprise Petitioner of the relationship between the guilt and penalty trials, and the probable adverse effect that a rejected alibi defense would have upon the outcome of the penalty hearing; (2) to adequately investigate mitigation evidence concerning Petitioner's background, and further failing to present mitigation evidence at the sentencing hearing; (3) to obtain a psychological or psychiatric evaluation of Petitioner; (4) to inform Petitioner of his right to testify at the penalty hearing; and (5) to present a coherent and competent penalty hearing. Petition, at 10–20.

### 1. Alleged Failure to Apprise Petitioner of the Relationship Between Guilt/Innocence Phase and Penalty Phase

■ Respondent asserts that Petitioner's claim of ineffective assistance of counsel based on trial counsel's failure to apprise Petitioner of the relationship between the guilt and innocence and penalty phases has not been exhausted, and further that the Court is procedurally barred from reviewing it now. Respondent's Brief, at 31–33. Respondent acknowledges that Petitioner raised the issue initially in his March 6, 1987 motion for post-conviction relief, but argues that Petitioner abandoned the claim on appeal before the Delaware Supreme Court. Petitioner does not dispute this, and provides noth-

---

**7.** Although Petitioner attempts to create an Eighth Amendment cruel and unusual claim out of the alleged errors of his trial counsel, such a contention is unavailing. The Court acknowledges that the Supreme Court has held that it is a violation of the Eighth Amendment for a state, by statute, or a judge to preclude a jury from considering mitigating evidence in a capital case. However, there is no authority that failure by counsel to present mitigating evidence results in a violation of the Eighth Amendment. The Supreme Court has consistently analyzed counsels failure to present mitigating evidence against the standards of the Sixth Amendment. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

ing to demonstrate that the issue was fairly presented to the state courts. *See Duttry v. SCIP Superintendent Petsock*, 878 F.2d 123, 124 (3d Cir.1989) (petitioner has burden of establishing that claims have been exhausted).

Moreover, an independent review of the record before the Court convinces the Court that the claim has not been fairly presented to the state courts. The Delaware Supreme Court did not address this issue on Petitioner's direct appeal. Moreover, the Superior Court conducted a three day hearing on Petitioner's allegations of ineffective assistance wherein Petitioner had ample opportunity, but failed to develop material facts to support this claim. Although the Superior Court wrote a lengthy analysis of Petitioner's ineffective assistance of counsel allegations, trial counsel's alleged failure to educate Petitioner regarding the relationship between the two phases was not addressed. Finally, Petitioner did not raise the issue when he appealed the Superior Court's denial of his post-conviction motion. Thus, the Court concludes that Petitioner has failed to exhaust his state court remedies.

 The Court also concludes that Petitioner's failure to present this claim to the state court on direct appeal and in his post-conviction motion constitutes a procedural default barring federal review of the claim on a petition for a writ of habeas corpus. *See DeShields v. Snyder*, 829 F.Supp. 676, 681–82 (D.Del.1993). Because there are no state court procedures available to Petitioner to present this claim to the state courts, however, the Petitioner's failure to exhaust this claim does not foreclose the Court's consideration of the remainder of the Petition. *Santana v. Fenton*, 685 F.2d 71, 74 (3d Cir.1982).

**2. Alleged Failure to Investigate and Present Evidence in Mitigation**

Petitioner asserts that his trial counsel failed to conduct a proper investigation into potential mitigation evidence of Petitioner's social and psychological background. Petitioner contends that through trial counsel's failure to investigate, the jury was deprived of substantial and persuasive mitigating evidence concerning: (1) "petitioner's mental and emotional age", (2) "petitioner's border-

line mental retardation", (3) "petitioner's emotionally disturbed personality which had specific roots in the tragic neglect and abuse surrounding his childhood", (4) "petitioner's adaptation to prison before his trial", and (5) petitioner's ability to live "a non-violent life in a highly structured environment, such as prison." Opening Brief, at 17.

 Petitioner first contends that his trial counsel was ineffective because he did not conduct a proper search for family members who could have provided mitigation information relevant at sentencing. Specifically, Petitioner asserts that his trial counsel failed to locate his sister, Gwen Riley, and two uncles, Melvin and Cecil Riley.

The Superior Court conducted a three day hearing on Petitioner's ineffective assistance of counsel allegations. Appendix, at 695–1003. At the hearing the defense presented the testimony of five family members, a forensic psychiatrist, a clinical psychologist and two criminal law experts. At the conclusion of the hearing, Judge Bush of the Superior Court of Delaware found that trial counsel did conduct a constitutionally adequate investigation into mitigating evidence. Judge Bush made the following specific factual findings with regard to counsel's attempt to locate Petitioner's family members:

1. Petitioner's counsel asked Petitioner about any family members who might be useful in this area. This discussion elicited Petitioner's mother and the Ross family as potential witnesses.

2. Trial counsel then contacted the Ross family. Some of the Ross family members did testify at the penalty hearing.

3. While trial counsel was aware of the existence of Cecil Riley and Melvin Riley, trial counsel was not provided with sufficient addresses or telephone numbers to locate these relations. Notwithstanding Mary Riley had spoken with Cecil Riley about the trial, he was never given concrete information about the trial until it was too late. The Rosses were unable to locate Melvin Riley by the date of trial.

4. Trial counsel had in fact attempted to contact both Gwen Riley and Petitioner's mother by letter but received no response.

5. Counsel went to Philadelphia prior to trial in an unsuccessful attempt to find Petitioner's mother and/or Gwen Riley.

6. When Petitioner and Walter Ross communicated with Gwen Riley about testifying at trial, she told them that she did not have time to come.

Appendix, at 1012–1015.

Based on these factual findings made by the Superior Court the Court agrees with the state courts' conclusions that Petitioner's trial counsel's efforts to investigate Petitioner's family satisfied constitutional standards as outlined in *Strickland.* Trial counsel's failure to "investigate" and present Petitioner's family history was due principally to the family's lack of accessibility or uncooperativeness. Counsel's failure to locate Petitioner's two uncles was not unreasonable considering counsel was not provided with one uncle's address, and the other uncle testified that neither defendant nor his family knew how to reach him in 1982. Counsel cannot be said to have been ineffective for failing to contact Petitioner's · sister when the record clearly indicates her receipt of letters from Petitioner and his counsel and her unwillingness at the time to help Petitioner. *See Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987).

Petitioner further alleges that his trial counsel was ineffective in not calling his mother, Gladys Riley and his cousin, Willis Moore, to testify at the penalty hearing. Although Petitioner does not offer an explanation as to why trial counsel's failure to call Petitioner's mother was constitutionally ineffective assistance of counsel, the Court assumes that the argument is based on the testimony of the two criminal law experts who testified at the state post-conviction hearing.

Both legal experts testifying for the defense testified that Petitioner's mother should have testified at the penalty hearing. When asked whether Mr. Young's decision not to call Petitioner's mother because he

feared that the State would cross-examine her on the failed alibi defense was a reasonable judgment, Mr. Dale Jones, one of Petitioner's legal experts, testified that it wasn't. In his opinion, Petitioner's mother's testimony was "too valuable in mitigation not to be used regardless of what transpired in the guilt phase." Appendix, at 872. Mr. Canan agreed. He testified that Petitioner's mother's testimony would have been relevant to placing Petitioner's life "in context" and to help the jury understand Petitioner and why he may have acted in the manner that he did. Appendix, at 926.

After considering this testimony, the Superior Court concluded:

However, as common sense would indicate, counsel need not introduce all existing mitigating evidence, especially when it is of little persuasive value or would cause more harm than good. As this Court concludes that counsel might have reasonably believed that the testimony of both Gladys and James Riley might have fallen into this category, this Court finds no error.

Appendix, at 1020–21 (citations omitted). The Superior Court found that trial counsel had at least three reasons for not calling Petitioner's mother: (1) Based on a conversation with Willis Moore, a cousin of Petitioner, trial counsel was concerned about Petitioner's mother's ability to take the stand. Moore testified that he informed trial counsel at the time that Petitioner's mother had been drinking and appeared drunk the one day she did attend trial; (2) Walter Ross testified that he informed trial counsel that Petitioner did not want Petitioner's mother questioned in a manner which would cast her in a bad light; (3) Trial counsel was concerned that Petitioner's mother would be cross-examined on the alibi defense, which she did not support.

In light of these findings, the Court cannot conclude that trial counsel's decision not to call Petitioner's mother to testify during the penalty hearing rendered his representation of Petitioner constitutionally infirm. *See Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) (attorney's decision to not call family to testify pursuant

to defendant's wishes was not unreasonable). Moreover, counsel could have reasonably believed that calling Petitioner's mother would do more harm than good. It is not up to the Court to second-guess trial counsel's strategic decisions.

Similarly, the Court refuses to second-guess trial counsel's decision not to call Willis Moore to testify at the penalty hearing. The Superior Court found the following facts with respect to counsel's failure to call Mr. Moore: (1) trial counsel knew about Petitioner's family circumstances and his childhood, (2) Mr. Moore and trial counsel spoke often during the trial phase, and (3) the alleged failure to call Mr. Moore resulted not from a lack of investigation, but from an affirmative decision not to call him in the penalty hearing.

Considering the record as a whole, the Court agrees with the Superior Court that Petitioner has failed to show that trial counsel's selection of penalty phase witnesses fell below professional standards given the information available to trial counsel at the time of the hearing. As the Superior Court stated, "there may have been sound considerations which dictated a selection of the five witnesses which were utilized." Appendix, at 1023.

In a related argument, Petitioner challenges trial counsel's "perfunctory manner" of questioning the five witnesses that were called by the defense at the penalty hearing. The examination of all five witnesses comprises approximately nine pages of the trial transcript. Appendix, at 660–669.[8] Petitioner asserts that trial counsel, in failing to question these witnesses in greater detail about his childhood prevented the jury from considering any rational or moral basis for exercising mercy.

The record reveals the following facts relevant to the issue of whether trial counsel's perfunctory examination of the five mitigation witnesses fell below Sixth Amendment standards:

1. Petitioner did not want his family background discussed at the penalty phase, Appendix, at 1026;

2. The evidence offered in mitigation included that the actual killer was Tyrone Baxter, that Baxter received a less severe penalty, and that Petitioner was a mild-mannered person, a diligent worker, with a good character, Appendix, at 1026;

3. Exploring Petitioner's background in greater detail would have brought out that Petitioner's parents were both alcoholics, his sister was an unwed mother of three, his brother was an incarcerated criminal, and his background was a series of jails and temporary living quarters, Appendix, at 1025;

---

8. By way of example, the Court sets out the direct examination of Walter Ross:

Q. Mr. Ross, do you know James Riley?
A. Yes, sir.
Q. How well do you know him?
A. Well, James live [sic] in my house with me.
Q. For how long?
A. I would say about three years.
Q. How old was he then on those different times if they were different times?
A. I would say about seventeen.
Q. The three years around the seventeenth year; is that what you are saying?
A. Yes. Right.
Q. Were you aware of his general comings and goings as much as any household member was?
A. Yes, I was.
Q. Do you have any belief as to James' nature, whether or not he is vicious, whether or not he is helpful and that sort of thing?
A. Yes. I think James is very, you know, he wasn't a violent person or anything. Always a good mannered person. Yes, sir. No, sir.

Q. Did he help around the house?
A. Yes, he did.
Q. Did you know him in any other capacity, Mr. Ross? Did you ever work with him?
A. Yes, he worked on my job with me.
Q. Where was that?
A. Jenkins Foods.
Q. Where?
A. Milford, Delaware.
Q. Are you from Milford?
A. Yes.
Q. What did he do with you on the job?
A. Well, he was a laborer and he worked very hard. He would work weekends and things. He even bought himself a car one time. He worked.
Q. He was a dependable worker then?
A. Yes, sir, he was.
Q. Is it your belief that he is a vicious individual?
A. No, it is not.

4. "[T]rial counsel gave a strong argument that Petitioner's life should be spared in light of the fact that Tyrone Baxter, Petitioner's accomplice and principal accuser, would be spared the death penalty as a result of the plea bargain." Appendix, at 1026; 676–678.

These findings, made by the trial court are clearly supported by the trial record and the record produced at the post-conviction hearing. Presuming these findings to be correct, the Court concludes that trial counsel's decision to limit the testimony at the penalty phase was not constitutionally deficient. It was within the range of reasonable professional judgment to forego the potentially and probable negative impact of the evidence concerning Petitioner's family and social history in favor of a plain plea for mercy focusing particularly upon the fact that Petitioner's accomplice escaped the death penalty by testifying against Petitioner.

Petitioner attacks the Superior Court's construction of "a series of 'strategic choices'" which it imputed to trial counsel as being unsupported by the record. However, the commands of *Strickland* require the Court to assume that the challenged decisions on the part of counsel were part of counsel's sound trial strategy. It is Petitioner's burden to rebut that presumption with specific record evidence to the contrary. Petitioner had the opportunity to question trial counsel regarding his motives in not questioning the penalty phase witnesses in greater detail, and in not calling the witnesses that Petitioner now asserts should have been called. In absence of any evidence to rebut the presumption, no constitutional error can be found.

### 3. Psychological/Psychiatric Evaluation

 Petitioner next argues that his trial counsel was ineffective because he failed to have a psychological evaluation conducted on Petitioner to probe for possible mitigating factors. At the state post-conviction hearing, the defense submitted into evidence the affidavits of Dr. Irwin Weintraub, a clinical psychologist, and Dr. Neil Blumberg, a forensic psychiatrist, and a report by Dr. Weintraub. Both of these doctors examined the Petition-

er and concluded that he suffered from mental and emotional frailties. Dr. Weintraub further concluded that Petitioner was a "very susceptible, impulse-driven adolescent and young adult who could be easily manipulated and used by others especially under stress." Petition, at 18.

The trial court found that Petitioner's trial counsel decided not to investigate possible psychological mitigating evidence because he believed it would not be beneficial based on his observations and discussions with Petitioner without the aid of a psychiatric expertise. Appendix, at 1016. The trial court also found that trial counsel had no inkling that evaluation of Petitioner's mental or emotional state might be helpful and in mitigation. Appendix, at 1016.

These findings are fairly supported by the record. During the evidentiary hearing, trial counsel stated that he never considered using a mental health professional in developing a social history for Petitioner because, based on his meetings with Petitioner, he felt that Petitioner understood what counsel communicated to him. Moreover, Petitioner had filed several pretrial motions on his own. And, finally, trial counsel remembered asking Petitioner whether Petitioner had any psychological problems.

On this record, the Court is unable to conclude that Petitioner's trial counsel's conduct in not presenting psychiatric or psychological mitigation evidence fell below Sixth Amendment standards for effective assistance of counsel. In *United States ex rel. Rivera v. Franzen*, 794 F.2d 314 (7th Cir. 1986), the court held that when counsel has no reason to know of a client's mental problems, the Sixth Amendment does not impose a general duty to explore the defendant's mental capacity. The Court of Appeals for the Fourth Circuit has also held that there is no constitutional basis for a rule which would require a psychiatric evaluation in every capital case. *Clanton v. Blair*, 826 F.2d 1354, 1358 (4th Cir.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988). In light of these authorities, and on the present record, the Court is satisfied that Petitioner's counsel's inquiry into Petitioner's

mental capacity was constitutionally adequate.

### 4. Trial counsel's failure to advise Petitioner of his right to testify at the penalty trial

■ Petitioner merely lists this alleged failure without elaboration or record evidence to support the allegation. As the Superior Court found, the only evidence presented by the defense in support of this claim is the statement by Petitioner's trial counsel that he could not remember whether he discussed Petitioner's right to testify at the penalty hearing. Appendix, at 843.

The Superior Court concluded that the defense failed to meet its burden of proving that this constituted ineffective assistance of counsel. Reviewing this conclusion under a plenary standard, the Court agrees with the state court's conclusion. Not only is there insufficient evidence to establish that trial counsel did not discuss the possibility of Petitioner testifying at the penalty hearing, there is an insufficient showing to warrant an evidentiary hearing that but for the preclusion of Petitioner's testimony, there exists a reasonable probability that the result would have been different. Absent such a showing the Court will dismiss Petitioner's claim for ineffective assistance of counsel related to trial counsel's alleged failure to notify Petitioner of his right to testify at the penalty hearing.

### 5. Alleged Failure to Present a Coherent and Competent Penalty Hearing

■ Essentially, Petitioner disagrees with trial counsel's strategic decision to plead for mercy based upon the fact that Petitioner's accomplice, the more culpable defendant, escaped the death penalty by testifying against Petitioner. Petitioner challenges counsel's closing arguments because he failed to refer to the existence of any mitigating circumstances in Petitioner's background or character.

As the Court has repeated above, counsel made the strategic decision to argue to the jury that "this is not the kind of killing that warrants the death penalty" because (1) it was not a vicious killing, but a reactive response to a bottle being thrown at him; and

(2) "it is entirely unjust and unfair to have Tyrone Baxter [receive a life sentence] and James Riley facing the death penalty." Appendix, at 675–679. In light of Petitioner's and Petitioner's family's uncooperativeness, the Petitioner's insistence on proceeding with the alibi defense, and the arguably aggravating nature of the available arguably mitigating evidence, the Court concludes that counsel's choice to proceed in the manner that he did was constitutionally adequate. *See Burger v. Kemp*, 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (court found trial counsel's failure to develop defendant's family history as a mitigating factor was reasonable where counsel chose to emphasize accomplice's culpability); *accord Green v. Zant*, 738 F.2d 1529, 1535–1537 (11th Cir.1984), *cert. denied*, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (court concluded trial counsel's failure to present mitigation witnesses was not constitutionally defective where counsel chose to argue that defendant was less culpable than a co-defendant).

Notwithstanding the reasonableness of trial counsel's representation, the Court also finds that Petitioner has failed to demonstrate that Petitioner would have received life as opposed to death had the case been presented as Petitioner now asserts. First, further discussion of Petitioner's background may have been detrimental.

Second, much of the asserted mitigating evidence presented by Petitioner in the state post-conviction proceeding was contradictory. Petitioner's sister testified that Petitioner was a bright kid, stayed to himself, kept out of trouble, took care of his parents, etc. The two mental experts, on the other hand, testified that Petitioner suffered from mental and emotional frailties, that he was borderline retarded, and easily manipulated by others. Petitioner's uncle's testimony also contradicted Petitioner's sister. Petitioner's uncle testified that in the year Petitioner lived with him in Connecticut, Petitioner was picked up for stealing. Considering the asserted mitigating evidence as a whole, the Court is unable to conclude that "absent the errors, [the jury] . . . would have concluded that the balance of aggravating and mitigating cir-

cumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

In sum, Petitioner's challenges to his trial counsel's conduct at the penalty phase all relate to trial counsel's failure to investigate, prepare, and present evidence in mitigation, which Petitioner alleges would have given the jury a reason for exercising mercy. But, as the state courts concluded, and absent evidence to the contrary, this Court must conclude, that trial counsel made a strategic decision to argue for mercy based on the relative culpability of the three defendants involved in the crime. Considering the totality of the circumstances in which this decision was made, the Court finds this decision to be a reasonable one.

Moreover, given the potentially negative impact the asserted mitigating evidence might have had on the jury and the fact that parts of the asserted mitigation evidence contradicted other evidence, the Court concludes that Petitioner has failed to demonstrate that trial counsel's failure to present the case now advanced by Petitioner would have resulted in a life sentence as opposed to death. As Petitioner has failed to satisfy either prong of *Strickland,* the Court will dismiss Petitioner's ineffective assistance claims.

### D. Trial Court's Failure to Question Prospective Jurors Regarding Whether They Would Automatically Impose Death Upon a Finding of Guilt

Petitioner next contends that the trial court violated his Sixth, Eighth and Fourteenth Amendment rights by failing to inquire during voir dire whether potential jurors would "automatically" impose the death penalty upon a finding of guilt. Petitioner asserts that if a juror had been seated who possessed the disposition to automatically impose the death penalty, then the standard announced by the Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct.

844, 852, 83 L.Ed.2d 841 (1985) was violated. In *Witt,* the Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether those views "prevent or substantially impair the performance of [the juror's] duties as a juror in accordance with his or her instructions and oath." *Id.*

The Supreme Court of Delaware in applying *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) [9] and *Witt* concluded that the voir dire conducted by the trial judge was sufficient to ensure that the Petitioner's "jury [was] able to vote impartially on the evidence and the law presented at trial." *Riley II,* 585 A.2d at 725. This finding is supported by the record. After explaining to the jury that the purpose of the questioning was to obtain twelve persons "who [would] impartially try the issues of this case upon the evidence presented in this trial without being influenced by other factors," the trial judge propounded the following question: "Is there any reason why you cannot render an impartial verdict based solely upon the law and the evidence?" Appendix, at 52, 56.

Notwithstanding the state court's conclusion, the Petitioner contends that he was not given adequate opportunity to identify those jurors who could not be impartial, but rather would automatically impose the death penalty. To support his argument the Petitioner directs the Court's attention to the Supreme Court's pronouncement in *Morgan v. Illinois,* ___ U.S. ___, ___ – ___, 112 S.Ct. 2222, 2230–2232, 119 L.Ed.2d 492 (1992).

In *Morgan,* the Court held that on voir dire a trial court must, at a defendant's request, inquire into whether a prospective juror would always impose death upon a finding of guilt. *Id.* The Supreme Court noted that part of a defendant's right to an impartial jury, as protected by the Sixth and Four-

---

**9.** In *Witherspoon,* the Supreme Court held that a "[s]tate infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment." *Witt,* 469 U.S. at 416, 105 S.Ct. at 848.

However, the Court also made clear that a state has a legitimate interest in excluding any juror who would automatically vote against the death penalty or who because of their attitude toward capital punishment could not be impartial. *Witherspoon,* 391 U.S. at 522 & n. 21, 88 S.Ct. at 1777 & n. 21.

teenth Amendments, is an adequate voir dire to identify unqualified jurors. The Supreme Court previously held in *Ross v. Oklahoma,* 487 U.S. 81, 85, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988), that a trial court's failure to remove for cause a juror who declared he would vote to impose death automatically upon a finding of guilt was constitutional error under *Witt.* It follows then, according to the Supreme Court, that upon request the defendant must be given the opportunity to identify jurors who would automatically impose death by questioning them at voir dire. *Morgan,* —— U.S. at ——, 112 S.Ct. at 2232.

■ Unlike the defendant in *Morgan,* the Petitioner did not request the trial court to conduct voir dire on the issue of whether the potential jurors would automatically impose death upon a finding of guilt. The Petitioner, nonetheless, would have the Court extend *Morgan* by declaring that the guaranty to an impartial jury requires the trial judge in every capital case to ask whether the prospective jurors would automatically impose the death penalty. The Court sees no reason to extend *Morgan* in the manner that the Petitioner seeks. Where, as here, the trial judge conducted voir dire adequate to ensure that the jury was impartial and the defendant did not request additional voir dire, the trial judge is not constitutionally required to question the jurors specifically on whether they would automatically impose the death penalty. Here, the state courts were satisfied that the actual jury seated was impartial. If Petitioner had specific reasons to challenge a particular juror's impartiality, it was his burden to request further voir dire.

Further, the Court is convinced that the state court finding that the jury that was actually seated was impartial is supported by the record. As Petitioner has presented nothing to indicate that this finding is clearly erroneous, the Court will dismiss Petitioner's claim that he was denied a right to a fair trial because the trial court did not inquire of the jurors whether they would automatically impose the death penalty.

### E. Alleged Prejudicial Remarks by the Prosecutor and Trial Court During the Penalty Phase

■ Petitioner also alleges that his Eighth and Fourteenth Amendment rights were violated because statements made by the prosecutor and trial judge improperly minimized the jury's sense of responsibility for imposing the death penalty. Opening Brief, at 26. In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court held that a death sentence imposed by a sentencing authority who has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere violates the Eighth Amendment.

The Petitioner points to two statements made by the prosecutor as error:

> As the Judge has explained to you we have a specific statute with regard to what occurred [sic] in a penalty hearing on a capital case. Let me say at the outset that what you do today is automatically reviewed by our Supreme Court and that is why there is an automatic review on the death penalty.

Appendix, at 641.

> Many times we do things that we are concerned about. Maybe in my generation when all of a sudden you are sitting around having a beer with a couple of fraternity guys and seven months later you are diving in the elephant grass in Vietnam—you do it because it was your duty and you were called. We are asking you to adhere to your responsibility to preserve law and order in our state and country. Based upon the law and based upon the facts you should return a verdict of death to James William Riley.

Appendix, at 644–645. In addition, Petitioner argues that the trial judge's repeated reference to the jury's decision on the penalty as a "recommendation" also tended to minimize the jury's sense of responsibility. Appendix, at 683–687.

This challenge to the prosecutor's statement was raised on Petitioner's direct appeal. The Supreme Court of Delaware distinguished *Caldwell* on the facts and made the following findings:

> [I]n the case at bar the prosecutor's remarks in no way suggested that responsi-

bility for ultimately determining whether defendant faced life imprisonment or death rested elsewhere. The prosecutor's comment to the jury that its decision would be "automatically reviewed" was fairly made in the context of the prosecutor's preceding reference to the "specific statute [controlling] a penalty hearing on a capital case." ... [T]he prosecutor in the instant case was simply quoting the statute. In no sense may it reasonably be said that the prosecutor was either misstating the law, misleading the jury as to its role, or minimizing its sentencing responsibility.

*Riley I,* 496 A.2d at 1025.

This finding is supported by the record. The prosecutor made only passing reference to the automatic review in the context of explaining the entire capital sentencing process as outlined by the statute. The Petitioner has failed to demonstrate that this finding is clearly erroneous. Therefore, the Court will dismiss Petitioner's Eighth Amendment challenge to the statements made by the prosecutor.

■ The Court likewise finds Petitioner's challenge to the trial judge's use of the word "recommendation" to be without merit. Petitioner raised this argument in his appeal of the Superior Court's denial of his state post-conviction motion. On appeal, the Delaware Supreme Court declined to consider the merits as previously adjudicated. The Court is unable to locate, however, any specific findings by the state courts regarding whether the trial court's use of the word "recommendation" to describe the jury's determination violated Petitioner's Eighth Amendment rights. Therefore, there are no state court findings entitled to a presumption of correctness.

Petition alleges that the trial court's description of the jury's determination as a recommendation belies any sense of finality and that taken in context with the prosecutor's statements serve to minimize the jury's sense of responsibility in violation of *Caldwell.* The Court does not agree.

The central concern in *Caldwell* was the apparent shifting of responsibility for imposing death from the jury to the appellate court. Taking the trial court's instructions as a whole, it is clear to the Court that this did not occur. For example, at the outset the trial judge told the jury, "You are to apply the law to the facts and in this way decide the punishment to be imposed in the case." Appendix, at 682. The trial judge continued on to quote from Delaware's criminal code:

A sentence of death shall not be imposed unless the jury finds:

(1) Beyond a reasonable doubt at least one statutory aggravating circumstance; and

(2) Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. *Where the jury submits such a finding and recommendation, the Court shall sentence the defendant to death. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.*

Appendix, at 48–49. Finally, just prior to concluding his instructions, the trial judge reiterated, "Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court." Appendix, at 686. On this record, the Court concludes that the trial court's use of the word "recommendation" did not render the jury instructions constitutionally defective under *Caldwell.*

### F. Prejudicial Publicity

Petitioner advances three separate arguments that his Sixth and Fourteenth Amendment rights were violated because his jury was exposed to prejudicial pretrial publicity. First, the Petitioner challenges the trial court's denial of his motions for transfer as constitutional error. Second, he argues that the voir dire conducted by the trial court was ineffective in ascertaining juror's exposure to pre-trial publicity. Third, Petitioner alleges that the trial court's decision not to sequester

the jury in light of highly prejudicial news reports was erroneous. Opening Brief, at 28.

[21, 22] The Supreme Court has held that due process guarantees a defendant the right to a "fair trial by a panel of impartial, 'indifferent' jurors" free from outside influences. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Where prejudicial publicity threatens the impartiality of the jury, due process requires a change of venue, sequestration of the jury, or a continuance until the threat abates. *Sheppard,* 384 U.S. at 363, 86 S.Ct. at 1523; *Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). A district court reviewing a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254, will overturn a trial court's findings of impartiality only for "manifest error." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984). This "manifest error" standard is no less stringent than the standard of the habeas statute which requires a presumption of correctness for state court findings that are "fairly supported by the record". *Id.* at n. 7 ("It may be there is little practical difference between the *Irvin* 'manifest error' standard and the 'fairly supported by the record' standard of the amended habeas statute.... In any case, we do not think the habeas standard is any less stringent.").

■ A change of venue need be granted only when the publicity is so highly inflammatory or sensationalized that the Court is able to presume prejudice, *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522–23, 16 L.Ed.2d 600 (1966), or if the defendant is able to demonstrate actual prejudice on the part of the jurors. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

■ Applying these standards, the Delaware Supreme Court found that a rational fact-finder could conclude that the pretrial news publicity cited by Petitioner had not

" 'so saturated and inflamed the local community that the proceeding was reduced to a 'hollow formality' warranting the procedural safeguard of a change of venue.' " *Riley I,* 496 A.2d 997, 1015 (Del.1985) (quoting *Rideau,* 373 U.S. at 726, 83 S.Ct. at 1419). This conclusion is fairly supported by the record. The Petitioner presented six isolated news articles to support his request for a change of venue, four of which were published six months or more from the date of trial. *See Murphy v. Florida,* 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975) (finding that Petitioner had received a fair trial was based in part on the fact that the news articles concerning the petitioner had appeared seven months prior to jury selection). Moreover, two of the articles did not mention the Petitioner. *Id.* at 801 n. 4, 95 S.Ct. at 2036 n. 4 (largely factual publicity less likely to cause unfair prejudice than that which is invidious or inflammatory).

Because the state court's findings that the jury was impartial and unaffected by the pretrial publicity are fairly supported by the record, they are entitled to a presumption of correctness. As Petitioner has presented nothing to the Court to demonstrate that the state court's findings are manifest error, the Court will dismiss Petitioner's challenge to the state court's denial of his change of venue motions.

■ Petitioner also contends that the voir dire was ineffective in probing prospective juror's exposure to pre-trial publicity. Although it appears that Petitioner raised an identical contention in his appeal from the state court's denial of his post-conviction motion, *see* Appendix, at 1208, the Delaware Supreme Court did not specifically address the adequacy of the trial court's voir dire.[10] Accordingly, the Court will conduct an independent review of this issue.

■ The trial judge made the following inquiries regarding prejudicial pretrial publicity. First, the trial judge asked the entire panel a series of 15 questions, two of which were, "Do you know anything about this case

---

10. The Court also notes that the Respondent does not address the Petitioner's challenge to the adequacy of the trial court's voir dire in assuring

that the jury seated was impartial and unaffected by pretrial publicity.

either through personal knowledge, discussion with anyone else or the news media?" Appendix, at 28, 54, and, "Is there any reason why you cannot render an impartial verdict based solely upon the law and the evidence?" Appendix, at 56. A total of 57 people responded affirmatively to one or more of the 15 questions.

Nine of the 57, when individually questioned, revealed that they had read or heard about the case from news media. In each case, the trial judge asked a series of follow up questions. For example, when venireperson Forbes responded that she had read about the case in the newspaper, the trial judge asked, "How long ago was the time you read an article about [the case]?" The trial judge followed up with a second question, "Taking into consideration what you have talked about the case and what you have read about the case, do you feel you could be a fair and impartial juror as to whether or not this defendant is guilty or innocent of the charge?" The trial judge excused Forbes when she expressed doubt as to whether she could be impartial. Similar questions were asked of all jurors who indicated they had heard about the case through the news media. The trial judge seated the jurors only after he was satisfied through voir dire that the jurors could render an impartial verdict based upon the law and the evidence.[11]

Of the 14 selected jurors only two indicated that they had heard about the case through the news media. Although two of the jurors who deliberated and returned the guilty verdict admitted to exposure to some pretrial publicity, the Court is convinced that the trial court's careful voir dire ensured that

---

11. The trial judge conducted the following voir dire before seating juror No. 11:

Q. Sir, would you first indicate to which questions you responded?
A. The one that whether you heard of the incident on the radio or read it in the newspaper. That was the one.
Q. You have read something about it in the newspaper?
A. Back when the incident happened.
Q. Have you heard anything on the radio?
A. Just that it is coming to trial, yes.
Q. This newspaper publicity that was at the time the alleged death occurred?
A. Yes. I subscribed to the Delaware State News so naturally I read it every night.
Q. What you have read in the paper, has that created any bias or prejudice for or against this defendant?
A. Not that I am aware of, no.
Q. Do you feel you can render an impartial verdict based upon, solely upon the law and the evidence?
A. I am certainly willing to try.
Q. Have you formed or expressed any opinion in regard to the guilt or innocence of the accused?
A. No, I have not.
Q. The key question I will repeat again. Because of what you have read in the newspaper, do you feel that you could sit here as an impartial juror?
A. Yes, because I know nothing of the evidence or anything else, yes.

The trial judge conducted the following voir dire on before seating juror No. 12:

Q. Would you indicate to which questions you responded this morning?
A. Huh?
Q. Would you indicate to which questions you came forward this morning?
A. Well, I know some of the witnesses.
Q. Who would that be?
A. Paulette Cannon.
Q. Who?
A. Paulette Cannon.
Q. What other witnesses?
A. Newspaper.
....
Q. You have read about this in the newspaper?
A. Yes, Your Honor.
Q. How long ago was that?
A. That was right after it happened.
Q. That was at the first of the year?
A. Yeah.
Q. Do you recall anything about what you read in the paper at this time?
A. Just vaguely, you know, and I do know one of the police officers.
....
Q. Now, as to the newspaper publicity, has that created any bias or prejudice against this defendant? Can you sit as a fair and impartial juror?
A. I really can't remember a lot of things that I read in the newspaper. It's been awhile back.
Q. Then do you know of any reason why you can't render an impartial verdict based solely upon the law and the evidence?
A. No, Your Honor.
Q. Have you formed or expressed any opinion in regard to the guilt or innocence of the accused here?
A. No, Your Honor.
Q. Do you have any bias or prejudice either for or against the accused here?
A. No.

Petitioner was not deprived of his Sixth Amendment right to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

Finally, Petitioner contends that he was denied his right to a fair trial by the trial court's refusal to sequester the jury despite "the circulation during trial of news reports highly prejudicial to the defendant's case, including references to lie detector tests taken by prosecution witnesses which would have been inadmissible at trial." Petitioner asserts that the trial judge's instruction to the jury not to read newspapers or watch television was ineffective, as was the perfunctory daily polling of the jury as to whether they had read, heard, or seen anything related to the case in the newspaper, radio, or television. Petition, at 31–32.

The Delaware Supreme Court made the following findings in reviewing the Superior Court's refusal to sequester the jury:

> [D]efendant has failed to establish that any prejudice resulted from the pre-trial newspaper reports upon which he relied in his venue application. Indeed, when two potentially prejudicial news articles concerning the case were published during the trial, the Court questioned the jury collectively and concluded that no juror had been exposed to the news media accounts.... Clearly, the Trial Court cannot be found to have abused its discretion in denying defendant's motion to sequester the jury throughout the trial.

*Riley I*, 496 A.2d at 1016.

 At the outset, the Court notes that jury sequestration is not a fundamental or constitutionally guaranteed right. *Young v. Alabama*, 443 F.2d 854, 856 (5th Cir.1971), *cert. denied*, 405 U.S. 976, 92 S.Ct. 1202, 31 L.Ed.2d 251 (1972); *see also United States v. De Peri*, 778 F.2d 963, 972–73 (3d Cir.1985) ("The decision whether to sequester the jury lies wholly within the discretion of the district court."). The central inquiry is whether jury sequestration was required to protect the defendant's right to a trial free from prejudicial publicity.

 After reviewing the entire record, including the voir dire transcripts, the Court is unable to conclude that the state court's finding that sequestration was not required is manifestly erroneous. The trial court instructed the jurors to avoid reading newspapers, listening to the radio, and watching television. Appendix at 192, 337, 354, 409, 491, 587, 599, 639. Moreover, when the two allegedly prejudicial articles concerning the Petitioner were published during trial, the trial judge questioned the jury and concluded that no jury member had been exposed to the news media. Appendix at 381–82, 409. The trial court's instructions, together with its questioning the jury about their exposure to publicity were sufficient to ensure that the Petitioner's jury remained impartial and unbiased. Accordingly, Petitioner's claim that his right to a fair trial was violated due to prejudicial publicity will be dismissed.

### G. The Duplicative Use of the Robbery Conviction

Petitioner also contends that the duplicative use of the underlying felony (robbery in the first degree) both as the basis for the first degree felony murder conviction and as a statutory aggravating circumstance (murder committed in the course of a robbery) to justify the death penalty under 11 Del.C. § 4209(e)(1)(j) violated the Eighth and Fourteenth Amendments.

In Delaware a defendant may be found guilty of first degree murder if he recklessly causes the death of another during the commission of a felony or if he commits an intentional killing. 11 Del.C. § 636. Petitioner was convicted of two charges of first degree murder—intentional murder and felony murder. The prosecutor asked for the death sentence only on the felony murder charge. The only statutory aggravating circumstance presented to the jury was that the murder was committed while the Petitioner was engaged in the commission of the felony of robbery.[12] Petitioner argues that because the commission of the felony of robbery was

---

**12.** A defendant is subject to the death penalty only if the jury finds beyond a reasonable doubt the existence of one of the statutory aggravating circumstances.

an essential element of the first degree felony murder charge, it should not also have gone to the jury as a statutory aggravating circumstance.

■ The Eighth Amendment prohibits the infliction of the death sentence under a system that permits it to be imposed in a wanton and freakish manner. *Lewis v. Jeffries*, 497 U.S. 764, 774, 110 S.Ct. 3092, 3098–99, 111 L.Ed.2d 606 (1990) (citing *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976)). One constitutionally approved manner of limiting the discretion of the sentencing authority to minimize the risk of arbitrary imposition of the death sentence is to require the sentencing body to find at least one statutory aggravating circumstance. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Requiring a sentencing authority to find a statutory aggravating circumstance serves to narrow the class of persons eligible for the death penalty. Delaware narrows the class of persons eligible for the death penalty by requiring the jury to find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. The Supreme Court has approved systems similar to that employed in Delaware. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ The Petitioner has presented no authority to support the proposition that using as a statutory aggravating circumstance an essential element of the charge is disproportionate or cruel and unusual in violation of the Eighth and Fourteenth Amendments. The Court concludes that reliance on the underlying felony to establish a statutory aggravating circumstance does not render Delaware's system so unprincipled and arbitrary that it violates the Eighth Amendment. Even if the felony murder statutory aggravating circumstance is found to exist, the Delaware statute does not mandate the death penalty. The defendant is still permitted to present any relevant evidence in mitigation to convince a jury that a life sentence is more appropriate than death. For these reasons, the Court concludes that the death penalty is not a cruel and unusual punishment for a defendant, like Petitioner, convicted of felony murder even where the sole statutory aggravating circumstance upon which the death sentence rests is the underlying felony.

**H. Trial Court's Denial of Petitioner's Motion to Appoint Co–Counsel or an Investigator**

■ Petitioner contends that his Sixth and Fourteenth Amendment rights were violated by the trial court's denial of his request for co-counsel and an investigator. Petitioner alleges this denial "severely impaired his ability to mount an adequate defense at the guilt/innocence phase of trial and to advance a persuasive case for leniency at the penalty phase. As a result, defendant was denied his rights to effective assistance of counsel, to a fair trial, and to equal protection of the laws." Petition, at 35.

Prior to trial defense counsel filed motions for the appointment of co-counsel and for funds to hire a private investigator. At a hearing on August 12, 1982, defense counsel stated his reason for requesting a private investigator:

MR. YOUNG: If it please the Court, Mr. Riley is incarcerated as the Court knows. He will be at least incarcerated in the foreseeable future and will continue to be incarcerated.

The defense involves Mr. Riley's allegation that he was not at the scene which is important to the defense to show that he was at a different scene if we possibly can.

There is no question that if Mr. Riley had private funds himself he would retain a private detective to pursue this sort of testimony and the only way we can do it is through a detective or through counsel and we feel that the retention of a private detective would be much less costly than having counsel do that kind of investigation in Pennsylvania.

THE COURT: Where is the other scene alleged to be?

MR. YOUNG: Philadelphia and Baltimore, Your Honor.

We would also point out that the State has three lawyers who are being compensated by the State for this matter. We would request cocounsel which has already

been denied and the private detective is vital to the defense in this case. D.I. 91, Transcript of August 12, 1982 Hearing on Motions, at 11–12. The trial judge denied defense counsel's request. D.I. 91, Transcript of August 12, 1982 Hearing on Motions, at 12.[13]

The Supreme Court of Delaware affirmed the trial court's decision, stating that Petitioner had failed to show that a private investigator was necessary to his defense, and that he was prejudiced by the trial court's refusal to appoint a private investigator or co-counsel. *Riley I*, 496 A.2d at 1017. The Delaware Supreme Court based its holding in part on the fact that the trial judge was not told that defense counsel would be unable to locate alibi witnesses, but only that it would be more economical to hire a private investigator. With regard to the trial court's refusal to appoint co-counsel, the Delaware Supreme Court stated:

> Defendant's contention that the case presented complex factual or legal issues is rebutted by the record. The State's case rested primarily upon the testimony of two putative co-defendants, Tyrone Baxter and Michael Williams, buttressed by defendant's fingerprints found at the scene. The defense was a simple alibi: that defendant was not with either Baxter or Williams on the day of the crime but rather in Philadelphia. Neither party relied upon any extensive scientific or psychiatric testimony. Defense counsel had six months to prepare for trial.

*Id.*

Petitioner has failed to make any showing that these findings should not be accorded a presumption of correctness. Based on these findings, the Court concludes that Petitioner received a fair trial with the effective assistance of counsel. Accordingly, Petitioner's claim that the trial court's refusal to appoint co-counsel and to authorize funds for a private investigator violated the Sixth and Fourteenth Amendments will be dismissed.

## I. Improper Jury Instructions

 Petitioner also challenges the jury instructions given by the trial court at the conclusion of the penalty hearing as inconsistent with the requirements of the Eighth Amendment.

### 1. The trial judge erred in failing to inform the jury that it must find the aggravating circumstances to outweigh the mitigating ones before imposing death.

The Petitioner first asserts that the failure of the trial court to inform the jury that in order to impose the death sentence the jury must find the aggravating factors to outweigh the mitigating ones violated the principles set forth in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). It is well settled that a sentence of death may not be imposed under a sentencing procedure that creates a substantial risk that it will be imposed in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). "[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey*, 446 U.S. at 429, 100 S.Ct. at 1765.[14]

Petitioner's challenge to the instruction appears to be that the instruction did not adequately guide the jury in accordance with the law of Delaware and therefore it violated the Eighth Amendment. Petitioner begins by arguing that "the Delaware Supreme Court has repeatedly emphasized that before a jury may impose a death sentence, it must find

---

**13.** On appeal, Petitioner cited as further justification for a private investigator the need to interview prospective prosecution witnesses. *Riley I*, 496 A.2d at 1017.

**14.** In *Godfrey*, the Supreme Court vacated a death sentence based upon a statutory aggravating circumstance that the murder was "outrageously or wantonly vile, horrible and inhuman."

*Id.* The Supreme Court stated, "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* The Court went on to note that the Georgia state courts did not instruct the jury in a manner to save the aggravating circumstance from a vagueness challenge. *Id.* at 432, 100 S.Ct. at 1766–67.

the aggravating circumstances to outweigh the mitigating ones." Opening Brief, at 31.[15] According to Petitioner, the jury must find the aggravating circumstances to outweigh the mitigating ones before the defendant becomes "eligible" to receive the death penalty.

The Court does not need to guess at what the law is in the State of Delaware with regard to death sentencing procedure because the Supreme Court of Delaware reviewed the trial court's instructions and concluded that the instructions comported with Delaware law. The Supreme Court of Delaware stated, "the jury in *Riley* understood that it was required to unanimously conclude that the aggravating circumstances outweighed those in mitigation."

This finding is supported by the record. The trial court told the jury twice that it was to "weigh" the aggravating and mitigating circumstances, Appendix at 683, 685, and further expressly told the jury to "weigh any mitigating factors *against* the aggravating factors to determine the penalty." Appendix at 685. While the trial court did not specifically tell the jury that it was to impose the death penalty only if the aggravating circumstances "outweighed" those in mitigation, the instructions read as a whole sufficiently conveyed that the jury was to impose the death penalty if after weighing the factors in mitigation against those in aggravation it felt that the aggravating factors outweighed the mitigating factors and that the death penalty was appropriate.

■ Further, the Court finds that the instructions were sufficient to satisfy the Eighth Amendment.[16] A distillation of the Supreme Court pronouncements in the area of capital sentencing reveals that in order to satisfy the Eighth Amendment, a capital sentencing system (1) must require the jury to find beyond a reasonable doubt at least one statutory aggravating circumstance before imposing death, (2) must allow the jury to consider mitigating circumstances, and (3) must provide meaningful appellate review where the state's highest court ensures that the penalty was not inflicted arbitrarily or disproportionately. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *Jurek v. Texas*, 428 U.S. 262, 271–72, 276, 96 S.Ct. 2950, 2956, 2958, 49 L.Ed.2d 929 (1976); *Gregg v. Georgia*, 428 U.S. 153, 195–97, 96 S.Ct. 2909, 2935–36, 49 L.Ed.2d 859 (1976).

■ Even though Delaware's statute contains each of these elements, and even though the jury was instructed accordingly, Petitioner argues that the Eighth Amendment requires the jury to find the mitigating circumstances to be outweighed by the aggravating ones before a sentence of death may be imposed. However, in *Gregg*, the Supreme Court approved Georgia's sentencing procedure even though it did provide specific standards to guide the jury's consideration of aggravating and mitigating circumstances. 428 U.S. at 196–97, 96 S.Ct. at 2936. In *Zant*, the Supreme Court made clear that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." 462 U.S. at 876 n. 13, 103 S.Ct. at 2742 n. 13. *See also Jurek v.*

15. Petitioner's jury was instructed:
The law provides that a sentence of death shall not be imposed unless you find beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommend, after weighing all relevant evidence in aggravation ... and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. You are to weigh any mitigating factors against the aggravating factors to determine the death penalty.

16. In *Gregg v. Georgia*, 428 U.S. 153, 195, 96 S.Ct. 2909, 2935–36, 49 L.Ed.2d 859 (1976) (Stewart, Powell, and Stevens, JJ., concurring) the Supreme Court found that the Eighth

Amendment's prohibition against imposing the death penalty in an arbitrary and capricious manner can be best satisfied by (1) a bifurcated sentencing proceeding, (2) where the "sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information. The Supreme Court approved Georgia's sentencing procedure, which like Delaware's requires (1) the jury to find beyond a reasonable doubt a statutory aggravating circumstance before death is imposed, (2) authorized the jury to consider any other appropriate aggravating or mitigating circumstances, and (3) an automatic appeal with a proportionality review by the state's highest court. *Id.* at 197–98, 96 S.Ct. at 2936–37.

*Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Accordingly, the Court finds that Petitioner's allegation that the trial court did not adequately instruct the jury that it was required to find the aggravating circumstances to outweigh the mitigating circumstances was not an error of constitutional magnitude.

**2. The trial judge's instruction that the jury had established beyond a reasonable doubt the existence of a statutory aggravating circumstance improperly shifted the burden of persuading the jury that death was inappropriate.**

■ Petitioner also contends the trial court improperly instructed the jury at the capital sentencing hearing that it had already found one statutory aggravating circumstance by virtue of its convicting Petitioner of felony murder. Petitioner argues this instruction "improperly shifted to the Petitioner the burden of persuading the jury that death was inappropriate." Opening Brief, at 37.

At the conclusion of the penalty hearing, the judge instructed the jury that the State contended that only one statutory aggravating circumstance existed:

(1) The murder was committed while the defendant was engaged in the commission of the felony of robbery.

Appendix at 684. The judge went on to instruct the jury:

In this case, the defendant has been convicted of violating 11 Delaware Code Section 636(a)(2) which reads: "Murder in the first degree, a person is guilty of murder in the first degree when: (2) In the course of and in furtherance of the commission of a felony, he recklessly causes the death of another person."

Therefore, that statutory aggravating circumstance has been established beyond a reasonable doubt, and you are so instructed.

Appendix at 865.

As the Respondent notes, Petitioner cites no authority to support his claim that the

Delaware statute sets out burdens of persuasion, not to mention that the trial judge's instructions unconstitutionally altered the appropriate burden of persuasion.[17]

Notwithstanding Petitioner's arguments, the Court agrees with the Delaware Supreme Court's conclusion that the jury was properly instructed in accordance with the United States Constitution. The trial judge told the jury that the required statutory aggravating circumstance had been established by the jury's finding of guilt on the felony murder charge. The trial judge went on to instruct the jury that it was to consider other non-statutory aggravating circumstances and any mitigating circumstances presented by the evidence. The jury was told to weigh the mitigating circumstances against the aggravating circumstances to determine the appropriate penalty. Reading these instructions as a whole, the Court concludes that the jury understood it was to weigh all aggravating and mitigating factors, and if they unanimously agreed that the aggravating factors outweighed the mitigating factors, death would be the appropriate penalty; otherwise the jury was to recommend life imprisonment.

**3. The trial court erred in failing to instruct the jury that it retained the option to recommend life imprisonment despite any aggravating factors found to exist and in implying that the jury must unanimously recommend that a life sentence be imposed.**

■ The Petitioner's final challenges to the trial judge's instructions are likewise without merit. First, Petitioner argues that the trial judge failed to explicitly instruct the jury that it was free to recommend life imprisonment notwithstanding the existence of a statutory aggravating factor. In *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), the Supreme Court stated that where the claim is that the instruction is ambiguous and subject to erroneous interpretation, "the proper inquiry . . .

---

**17.** Contrary to the underlying assumption present in Petitioner's argument, it would not be unconstitutional for a state to place on the defendant the burden of proving mitigating circum-

stances sufficient to compel leniency. *Walton v. Arizona,* 497 U.S. 639, 649, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990).

is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."

As the Delaware Supreme Court concluded, the instructions read as a whole clearly conveyed to the jury that once a statutory aggravating factor was found to exist, the jury was to weigh all evidence in aggravation and mitigation to determine the appropriate penalty. Clearly, this left open the option for the jury to recommend life based upon the presence of mitigating factors notwithstanding the existence of the statutory aggravating circumstance.

The same can be said of Petitioner's contention that the jury was misled to believe that the imposition of a life sentence was subject to a unanimous vote. The Court agrees with the Delaware Supreme Court that the instructions clearly conveyed that if the jury did not unanimously agree, after considering all the evidence in aggravation and mitigation, that death was the appropriate penalty, life imprisonment would be imposed.

### 4. The Trial Court's Repeated References to the Possible Existence of Multiple Statutory aggravating circumstances improperly misled the jury to consider aggravating factors other than the underlying felony.

The Court is similarly unpersuaded that the jury was confused and misled by the trial judge's reference to the possible existence of other statutory aggravating circumstances. The Delaware Supreme Court found that there was no basis for concluding that the jury was confused over the available statutory aggravating circumstances. The Court agrees.

Even if the jury was led to believe that other statutory aggravating circumstances may have been presented by the evidence, the interrogatory to the jury was clear: it limited the jury's consideration to whether it found the felony murder statutory aggravating circumstance to exist. If the jury had been unable to agree unanimously as to the existence of the felony murder statutory aggravating circumstance, the interrogatory instructed the jury that the jury's deliberation

was at end. This interrogatory, which was read out loud to the jury by the trial judge, was sufficient to prevent any confusion regarding the existence of other statutory aggravating circumstances.

Because the Court finds that Petitioner's jury was properly instructed in all respects the Court will dismiss Petitioner's claim that the instructions violated his rights guaranteed by the Eighth and Fourteenth Amendments.

### J. The Delaware Supreme Court's Proportionality Review

Finally, Petitioner contends that the Delaware Supreme Court's proportionality review under 11 Del.C. § 4209(g)(2)(a) was so arbitrary and capricious as to violate his rights to due process and equal protection guaranteed by the Fourteenth Amendment and his right to be protected from cruel and unusual punishment guaranteed by the Eighth Amendment.

The Eighth Amendment requires states that authorize the death penalty to impose the penalty through a sentencing procedure that narrows the group of defendants who may be determined eligible for the death penalty. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). As long as the sentencing scheme sufficiently restricts the discretion of the sentencing authority to preclude the arbitrary infliction of the death sentence, the Eighth Amendment does not require a "comparative proportionality review by an appellate court...." *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984).

The guarantees of the Eighth Amendment have been satisfied in Delaware's statutory scheme without comparative proportionality review. Delaware's bifurcated sentencing procedure properly narrows the class of persons upon whom a death sentence may be imposed by requiring the jury to find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. At the penalty hearing additional evidence may be offered to establish any additional aggravating or mitigating

factors. At the close of the penalty hearing, the jury is instructed to consider all of the evidence in aggravation and mitigation in reaching its sentencing determination. A sentence of death may only be imposed by a unanimous jury. This system, without any comparative proportionality review, adequately meets the concerns expressed by *Furman* and its progeny.

■ Although not constitutionally required, the Delaware sentencing statute provides for and the Delaware Supreme Court did review Petitioner's sentence for comparative proportionality. After comparing Petitioner's sentence to the sentences imposed in all other first degree murder cases which went to trial and to a penalty hearing and in which the trier of fact found a statutory aggravating circumstance, the Delaware Supreme Court concluded "that the imposition of death in this case was not disproportionate to the penalties imposed in the 21 other cases referred to above." *Riley I,* 496 A.2d at 1027.

In arriving at this conclusion the Delaware Supreme Court found a number of "common characteristics between the death sentence imposed upon Riley and others imposed upon Whalen, Rush, Deputy, Flamer and Bailey." *Id.* These commonalities included (1) "an unprovoked, cold-blooded murder of a helpless person (or persons) committed upon victims lacking the ability to defend themselves and solely for purposes of pecuniary gain (except in Whalen's case", (2) "except in Whalen's case, the murder occurred in the course of a robbery that was deliberately planned and carried out with the use of deadly weapons", and (3) "the perpetrators of these crimes offered no extenuating circumstances for taking the life of another." *Id.*

■ Although the Petitioner raises a number of challenges to the state court's conclusion, the United States Constitution does not require this Court, on habeas review, to look behind the state court's conclusion on proportionality where it is clear that the state court conducted its proportionality review in good faith. *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The Delaware Supreme Court clearly undertook its proportionality review in good faith and found that Petitioner's sentence was proportional to the sentences imposed in cases similar to his. Accordingly, the Court will dismiss Petitioner's disproportionality claim.

## V. CONCLUSION

For the reasons discussed above, Petitioner's request for a writ of habeas corpus will be denied. A certificate of probable cause for an appeal shall issue, and the stay of execution imposed by the Court on August 13, 1991, will be continued pending appellate review by the Court of Appeals for the Third Circuit.